Estate of Douglas S. Mackall, Sr., Deceased, Douglas S, Mackall, Jr., Executor v. Commissioner.
Estate of Mackall v. Commissioner
Docket Nos. 1777, 3211, 3212.
United States Tax Court
1944 Tax Ct. Memo LEXIS 182; 3 T.C.M. (CCH) 701; T.C.M. (RIA) 44231; July 17, 1944
*182 Robert A. Littleton, Esq., 1021 Tower Bldg., Washington, D.C., for the petitioner. E. M. Woolf, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these three consolidated proceedings petitioner, executor of the Estate of Douglas S. Mackall, Sr., deceased, challenges deficiencies in Federal income taxes of decedent as follows: 1939
$ 171.89
1940
3,386.87
1941
374.63
The sole question presented is whether certain real estate sold in each of the years was "property held * * * primarily for sale to customers in the ordinary course of * * * business" thus removing the limitation on taxable gains under the terms of section 117 of the Revenue Act of 1938. Findings of Fact Petitioner's decedent, Douglas S. Mackall, Sr., hereinafter sometimes referred to as petitioner or decedent, prior to his death on February 17, 1943, had been a resident of Langley, Virginia, and had filed his income tax returns for the years in question, 1939 to 1941, inclusive, with the collector of internal revenue for the district of Virginia. From 1917 until 1939 petitioner was engaged in the practice of law in Washington, D.C., with the exception of two or three *183 years around 1920 when he devoted his time chiefly to the affairs of the Langley Land Co., a corporation engaged in the real estate business. In most of the years from 1917 to 1938 he reported in his Federal income tax returns income from his law practice and also income received as gains on the sale of real property. Returns for the years 1917 to 1938, inclusive, with the exception of 1918 and 1925, (the returns for which years are not in evidence) disclose the following: Income from
Gains from
Legal
Sale of
Description of Real Estate
Year
Profession
Real Estate
Sold or Exchanged
1917
$9,177.88
1919
4,049.61
$ 440.00
4 lots; 1 bungalow and 2 lots
1920
None
1,275.05
2 houses
1921
None
186.25
1922
None
1,380.69
4 1/2 lots; 1 house and lot
1923
4,766.95
2,817.44
2 frame houses, vacant land
1924
3,192.23
830.83
Interest in vacant lots; 10 acres vacant land;
one-half interest in 43 acres vacant land.
1926
3,236.45
341.68
One-fourth interest in vacant land
1927
2,967.31
480.79
1 frame bungalow
1928
4,012.84
1929
3,998.23
251.78
One-half interest frame house
1930
3,742.24
3,818.70
4 vacant lots; dwelling and lots; vacant lands
1931
3,291.08
1,530.08
13 acres vacant land
1932
2,901.02
1933
3,636.62
1934
2,627.57
217.50
5 acres vacant land
1935
2,720.23
1936
4,118.04
907.95
One-half interest in land
1937
5,123.84
2,209.09
Dwelling; 1 1/2 acres - 3 unimproved lots; 4 un-
improved lots
1938
5,328.17
2,473.07
1 dwelling and 3 lots; 2 parcels; 1 acre im-
proved land;.78 acres unimproved land;
.75 acres and building; 122 acres
*184 In 1939 petitioner retired from the practice of law. In that year he made various sales of real property. The following table shows the property sold, the date of acquisition, the source of acquisition, the cost, the selling price and the profit: TABLE NO. 1 - 1939 Profit
Date - Description
Total Cost
Selling Price
(Loss)
Item # 1. 1937
Cotor House & lot
$1,575.59
$2,472.66
$897.07
Item # 2. 1925
10 acres lands
2,930.72
3,000.00
69.28
Item # 3. Aug. 8, 1934
Langley Land Co. 2 acres
1,296.78
2,500.00
1,203.22
Item # 4. Oct. 28, 1933
Courtlands Title Co. 2 lots W. McLean
56.38
300.00
243.62
Item # 5. Dec. 2, 1932
Courtlands Title Co. 39.551 acres Meadow-
brook Farm: Land
6,405.28
9,689.41
3,276.21
Building
13,229.57
12,693.11
(526.46)
Total
$30,655.18
In 1940 petitioner made other sales of real property and the following table shows the property sold, the date acquired, the source of acquisition, the total cost, the selling price, and the profit, including profit on installment sales attributable to 1940: TABLE NO. 2 - 1940 Profit
Date - Description
Total Cost
Selling Price
(Loss)
Item # 1. 1939
1.56 acres
$721.76
$2,000.00
$1,278.24
Item # 2. 1930-40
3 lots
1,310.00
1,100.00
(210.00)
Item # 3. 1930-40
3 lots
1,124.48
1,000.00
(124.48)
Item # 4. 1940
1 lot
608.22
1,000.00
391.78
Item # 5. Jan. 2, 1918
Courtlands Title Co. 3 1/2 acres
300.00
3,000.00
2,700.00
Item # 6. 1937
5 lots
375.00
600.00
225.00
Item # 7.
1,174.97
1,750.00
575.03
Item # 8. Aug. 8, 1934. Langley Land Co.
1,156.36
2,000.00
843.64
Item # 9. Acreage
449.38
1,100.00
650.62
Item # 11.
543.39
1,000.00
456.61
Item # 12. Jan. 19, 1932
Langley Land Co. 5 acres Home Place - 1890
- house
4,168.56
7,500.00
3,331.44
Item # 13. Oct. 28, 1933
Courtlands Title Co. 81 lots
2,953.31
8,675.00
5,721.69
Item # 14. Mar. 10, 1925
Wm. W. Mackall & Wife McLean office and
lot
1,528.38
7,500.00
5,971.62
Total
$38,225.00
*185 Installment Sales
Selling
Profit
Date - Description
Cost
Price
Profit
1940
Sale of 4.5 acres of land from Langley Land
Co.
$2,445.25
$4,000.00
$1,554.75
$ 388.70
Item # 15. 1939 - Sale of 2.241A Land from
Funkhouser Tract to Deverold 2/3 interest
905.54
2,666.67
1,761.13
220.12
Item # 16. Sale of 4.646A Land from Funk-
houser Tract to Bradley - 2/3 interest
1,877.35
6,000.00
4,122.65
687.11
In 1941 petitioner made still other sales of real property, and in addition again received certain payments on installment sales. The following table shows the relevant details of the transactions: TABLE NO. 3 - 1941 Date - Description
Total Cost
Selling Price
Profit
Item # 1. Dec. 2, 1932
Courtlands Title Co. remainder Meadow-
brook Farm
$8,421.06
$10,500.00
$2,078.94
Item # 2. Aug. 8, 1934
Langley Land Co. 1 acre
516.14
1,250.00
733.86
Item # 3. 1937
30 lots
728.40
3,000.00
2,271.60
Total
$14,750.00
Item # 4.
Selling
Profit
Installment Sales
Cost
Price
Profit
1941
Sale of 4.5 acres of land from Langley
Land Co.
$2,445.25
$4,000.00
$1,554.75
$388.70
Item # 5.
Sales of 2.241A land from Funkhouser
Tract 2/3 interest
905.54
2,666.67
1,761.13
1,541.01
*186 During the years 1939, 1940, and 1941, petitioner's net income, as shown by his income tax returns, was $6,478, $11,825, and $2,767, respectively; the corresponding capital gains were $2,966.07, $10,999.77, and $4,730.59, while the total gross sales price; of the assets listed for the years in question were $30,655.18, $38,225, and $14,750, respectively. Petitioner was sick, during the period from 1939 to his death, and during the course of his illness underwent three major surgical operations, having both his legs amputated. He incurred medical expenses in connection with his illness, including the cost of nurses, doctors, hospital bills, and medicines. After his retirement in 1939 petitioner's principal source of income was the proceeds of the sales of his real property. The real estate sales shown in the above tables were made at his direction by his son who was in the real estate business and who acted as his agent. The son only sold property when authorized and directed to do so by petitioner. Petitioner had no office in Virginia during the years in question. Even after his retirement, petitioner continued to describe his "principal occupation or profession" as "Lawyer" until *187 1941 when it was noted as "retired." Petitioner and his brother inherited some land. They formed the Langley Land Co. to deal in land sales. At the time of his death petitioner owned about one-half the stock in that company. Petitioner in 1934 acquired certain land from that company in exchange for a debt owed to him by it. The land was scattered acreage land and had not been farmed for some fifteen years before petitioner acquired it. The land so acquired and sold in the years in question included Item 3, Table No. 1; Items 7, 8, 9, 11, Table No. 2; and the Tavern lot sold as part of Item 12, Table No. 2, and Item 2, Table No. 3 above. Petitioner was a stockholder of the Courtlands Title Co. and when it was liquidated in 1933 he acquired certain land formerly held by that company in exchange for his stock. This included Item 4 of Table No. 1 and Item 13 of Table No. 2. In 1932 he acquired from Courtlands Title Co. the Meadowbrook Farm sold in part as Item 5, Table No. 1, and in part as Item 1, Table No. 3. The lands acquired by petitioner from the Courtlands Title Co. had been divided into lots before petitioner acquired them. Petitioner also had acquired from the Courtlands Title *188 Co. by deed in 1918 the property sold as Item 5, Table No. 2 above. Prior to 1932 petitioner held a first mortgage or trust deed on Meadowbrook Farm sold by him in part as Item 5, Table No. 1, and Item 1, Table No. 3. The mortgage was in effect foreclosed and title deeded to the Courtlands Title Co. which in turn deeded it to petitioner. The mortgagor was petitioner's sister-in-law and a second mortgage was held by her brother-in-law. The "McLean office and lot" sold in 1940 had been used as a real estate office by petitioner's son but not by petitioner. It was located about a mile and a quarter from petitioner's residence. Items 1, 15, and 16, Table No. 2, represent the sale of petitioner's interest in the "Funkhouser Tract." In 1939 a real estate agent approached petitioner's son and told him he knew of a person who desired to buy 10 acres of a 25-acre tract owned by one Funkhouser who was willing to sell the entire tract for $25,000, but unwilling to sell part of it. Petitioner purchased two-thirds of the land and his son one-third. Item 1, Table No. 2, represents a sale of petitioner's two-thirds interest in 1.56 acres of the Funkhouser land, and Items 15 and 16, Table No. *189 2, represent sales of petitioner's two-thirds interest in two other parcels from the Funkhouser Tract. Petitioner's interest in the remaining land was deeded to his son. In Docket No. 1777, involving 1939, respondent determined that petitioner's profit on the sale of real estate was includible at 100 percent "since it is held that you are a dealer in real estate and the limitations of Section 117(b)(c) and (d) of the Internal Revenue Code are applicable." In Docket No. 3212, involving 1940, respondent determined that petitioner was not entitled to the benefits of section 117(b), (c), and (d) of the Code with respect to profits derived from sales of real estate "since such profits did not result from sales of capital assets as defined in Section 117(a)(1) of the Code." The same determination was made in respect to Docket No. 3211 involving 1941. Opinion Although the record is unsatisfactory without the testimony of the principal participant, the inference of fact urged by petitioner seems to be satisfactorily established, that decedent's purpose was to obtain funds by the liquidation of his property. If so, however, it would seem to follow that he was holding this property primarily *190 for sale. In such a case any purchaser would presumably be his customer. Greene v. Commissioner (C.C.A., 5th Cir.), 141 Fed. (2d) 645. But the statute [1] requires more than this to transform the resulting gains into ordinary income. The sales in question must be "in the ordinary course of his trade or business" which, of course, assumes the existence of a business in the course of which such transactions may occur. Richards v. Commissioner (C.C.A., 9th Cir.), 81 Fed. (2d) 369. This we regard *191 as the pivotal issue here. It has been resolved in other situations by an examination of the "frequency and continuity" of the dealings. Commissioner v. Boeing (C.C.A., 9th Cir.), 106 Fed. (2d) 305, certiorari denied 308 U.S. 619. It may also depend to some extent on the history of the property, including the method of acquisition, cf. Greene v. Commissioner, supra, and on the subsequent conduct of the operation. Ehrman v. Commissioner (C.C.A., 9th Cir.), 120 Fed. (2d) 607, certiorari denied, 314 U.S. 668. Approached from any of these viewpoints it does violence to this record to conclude that the decedent was in the real estate business. Much of the property sold was acquired by inheritance; other pieces were taken in payment of debts or upon liquidation. Although it is true, as shown by Richards v. Commissioner, supra, that the language of the statute precludes overemphasis of the original acquisition in contrast to any subsequently demonstrated purpose, yet it is difficult to escape the impression *192 that carrying on the business of disposing of property ordinarily imports some accompanying means of acquiring the stock in trade. Where there is no countervailing evidence, it is reasonable to weigh that factor with the other circumstances shown by the evidence. Its importance may be radically diminished where subsequent operations, such as subdivision and development, partake in themselves of the nature of a business. See Ehrman v. Commissioner, supra;Richards v. Commissioner, supra; cf. Sparks v. United States, (U.S. Dist. Ct.), 55 Fed. Supp. 941. But no such element is present here. Most of the parcels had apparently been held for long periods of time without being disposed of. See Harriss v. Commissioner (C.C.A., 2nd Cir.), 143 Fed. (2d) 279. Not only does this violate the concept of an organized business, but it exemplifies the fundamental purpose of the provisions limiting the taxation of long term capital gain. The original step in this direction, section 206(b), Revenue Act of 1921, was accompanied by the statement: * * * Under the present law many sales *193 of farms, mineral properties, and other capital assets have been prevented by the fact that gains and profits earned over a series of years are under the present law taxed as a lump sum and the amount of surtax excessively enhanced thereby. * * * (Senate Finance Committee, 67th Cong., 1st Sess., Senate Report 275, p. 12). As for the frequency and continuity of sales, it is shown that over a 20-year period, with the exception of two years not in evidence, real estate transactions were infrequent and intermittent. Up to the year 1937 the number of sales in each year averaged less than two and in at least four of such years none occurred. Cf. Ehrman v. Commissioner, supra, where 186 sales occurred in a single year. It is true that in the six years immediately prior to decedent's death the number of sales considerably exceeded the prior average. But in the three of such years before us here decedent was in ill health, and it strains the facts to infer that if he had not been in the business prior to that time, he could be thought of as embarking upon it when his physical condition was actually forcing inactivity. George H. Peck, 19 B.T.A. 345; *194 see Leonhard Felix Fuld, 44 B.T.A. 1268 [Dec. 12,046], affirmed (C.C.A., 2nd Cir.), 139 Fed. (2d) 465. On the contrary, decedent's need to liquidate his long-term holdings in order to obtain cash would indicate the reverse of an intention to conduct a business. George H. Peck, supra;Leonhard Felix Fuld, supra. The facts shown by the record are in accord. We are consequently satisfied that these assets were not held for sale in the ordinary course of petitioner's trade or business and hence that they were capital assets subject to the capital gains provisions. Decision will be entered under Rule 50. Footnotes
1. SEC. 117, Internal Revenue Code. "(a) * * * "(1) CAPITAL ASSETS. - The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1)."↩