Minnie Steinau Loewenberg v. Commissioner.
Loewenberg v. Commissioner
Docket No. 14378.
United States Tax Court
1948 Tax Ct. Memo LEXIS 72; 7 T.C.M. (CCH) 702; T.C.M. (RIA) 48197; October 11, 1948
Iverson Walker, Esq., Mercantile Bank Bldg., Dallas, Tex., for the petitioner. J. Marvin Kelley, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding was brought for a redetermination of deficiencies in income tax of $2,449.07 and $724.57 for the years 1943 and 1944, [1] respectively. The parties having agreed upon the disposition of one issue, and petitioner having conceded another, the only remaining issue is whether gain realized from the sale of real estate in the years in question is capital gain or ordinary income. The parties filed a stipulation of the facts, and evidence was adduced at the hearing. Findings of Fact
*73 The stipulated facts are hereby found accordingly. Petitioner, a resident of Dallas, Texas, filed her Federal income tax return for the year 1942 with the collector of internal revenue for the district of Maryland, and filed her returns for 1943 and 1944 with the internal revenue agent in charge in the second district of Texas. During the years 1942, 1943, and 1944, she made sales of real estate, upon which she realized gains as follows: 1942
1943
1944
Gross sales
$4,693.39
$2,092.25
$3,491.40
Cost or other basis
1,456.00
600.00
1,096.00
Gain
3,237.39
1,492.25
2,395.40
All of these sales were property in Trinity Heights, an addition to the City of Dallas, Texas, except for isolated sales in 1943 and 1944 of $350 and $200, respectively. Petitioner is a widow 74 years of age whose husband, Phillip Loewenberg, died in 1933. Sometime prior to 1933 the Trinity Heights Addition was created by the Trinity Heights Annex Company, a corporation. The corporation being the owner of the land, prepared and filed a plat of the addition, subdivided it into lots and improved a substantial part of the addition by putting in streets, sidewalks, and utility *74 lines. In the north portion of the subdivision sewers were also installed. Neither Phillip Loewenberg nor petitioner ever had any stock in the corporation, but at the time of Phillip's death the corporation was indebted to him in the amount of approximately $90,000, represented by a note secured by a mortgage on the real estate in the Trinity Heights Addition. Upon Phillip's death petitioner inherited all of his interest in the note and mortgage. On or about June 5, 1934, she acquired title to the Trinity Heights Addition by foreclosure or conveyance in lieu of foreclosure. The property so acquired contained 258.03 acres. As originally subdivided, the property consisted of 1,056 lots of which 142 had been sold, leaving 914 lots remaining at the time of petitioner's acquisition. After petitioner acquired the property neither she nor anyone acting for her resubdivided, replatted or improved the property. The only improvements made were the paving of certain streets adjacent to the public school. The paving was done by the City of Dallas and petitioner was required to contribute $2,300 to the paving cost. She did this under protest. Petitioner desired to dispose of Trinity Heights *75 property in bulk, but efforts to do so proved fruitless. Such sales of lots as were made were not the result of petitioner's initiative but were by reason of purchasers approaching petitioner and seeking to buy the lots. Prior to 1941, the total sales made by petitioner of the lots held by her in Trinity Heights Addition were as follows: 1934 -
7 lots for a total consideration of $2,477.64
1937 -
1 lot for $435.50
1939 -
2 lots for a total of $900.00
1940 -
1 lot for $670.00 The gains from these sales were reported as capital gains. Late in 1940 Messrs. H. S. Jopling and Curtis P. Bower, doing business as the Eighth and Corinth Lumber Co., approached petitioner proposing that the Lumber Company would purchase lots in the subdivision and construct houses thereon. This proposal resulted in a contract between petitioner and the Lumber Company, executed December 19, 1940. The contract recited that petitioner owned the subdivision land, and the buyers, the Lumber Company, desired to purchase "all and sundry said lots" for the purpose of erecting residences for sale to the public at large; that the parties had agreed on plans and specifications for the houses, *76 and that they had selected six lots on which the buyers were to erect houses in accordance with the plans. It was provided, inter alia, that the buyers would build the six houses in accordance with the Federal Housing Administration regulations and to the satisfaction of Lawrence T. Beck & Co., petitioner's consulting engineers, and maintain them in good condition until sold or paid for; that on a satisfactory showing petitioner would give the builders an exclusive option to purchase the remainder of the lots; that petitioner would endeavor to secure the privilege of replatting the lots; that the lots were to be sold by petitioner to the buyers but petitioner obligated herself to make conveyance to the buyers or their nominees after the erection of the houses; that the price of the lots in the north section would be $8 per front foot and the price of the lots in the south section would be $4 per front foot, to which would be added the cost of any necessary improvements such as utilities; that the houses were to be built in groups of six unless it was determined that this was not justified, in which event the acquisition of fewer lots was provided for; that if there was an excessive *77 demand beyond the capacity of the buyers, petitioner was entitled to sell lots for building purposes to meet the demand under arrangements not more favorable than those given to the Lumber Company. Provisions were made to satisfy the requirements of the Federal Housing Administration. It was further provided that petitioner would make loans to the buyers for temporary financing, such loans to be made upon periodic progress inspections. The loans were to be evidenced by notes executed by the buyers, payable to petitioner and bearing interest at the rate of 5 percent. They were for 120 days from the date of the note, subject to prepayment before maturity with a possibility of extension to the maturity date of the last note. This type of financing was to be limited to $15,000 and obtained exclusively from petitioner, additional money to be obtained from outside sources. Petitioner was granted a specific lien on each lot and house for all sums that might be due and owing to her from the buyers. She was not required to make conveyance until payment had been made. It was also provided that when the buyers contracted a sale of a house and lot, notification was to be given to set in motion *78 the settlement machinery which included payment to petitioner of the money advanced and the price of the lot, a down payment on an additional lot, and 5 percent to Lawrence T. Beck & Co., petitioner's consulting engineers. It was provided that if a house remained unsold for six months after completion, the buyers were to pay petitioner the sums due, including the price of the lot and fees to the engineers. The contract also provided that the buyers were to carry insurance against fire on the construction work and other insurance, including workmen's compensation insurance. If the buyers failed to comply with the provisions of the agreement or ceased operations, the contract could be canceled at the discretion of petitioner's consulting engineers, in which event all working material on the site was to be taken over by petitioner and credited against any amount due petitioner. The contract concluded: "This contract shall in no event constitute a partnership between owner and buyers, nor a joint venture, but a contract for the sale of lots by owner to buyers, the other provisions hereof being made to enable buyers to accomplish the purchase and resale of owner's lots, and buyers shall *79 in no sense be considered the agents of owner, and shall not be authorized to obligate owner or her property in any way, or to do any act creating a charge or lien against owner's property." Under the terms of this contract petitioner sold 19 lots to the Lumber Company in 1941 for a total consideration of $7,930. The contract with the Lumber Company was cancelled in 1942. During that year and prior to the cancellation of the contract and in accordance with its provisions petitioner sold eight lots to the Lumber Company for a total consideration of $2,893.39. During the years in controversy the following sales were made from Trinity Heights to purchasers other than the Lumber Company after the cancellation of the lumber contract: 1942 -
1 tract of six lots for a consideration of
$1,800.00
1943 -
4 lots for a total consideration of $1,742.25
1944 -
7 lots for a total consideration of $3,291.40 In addition, petitioner made the following sales of property not in Trinity Heights: 1943 -
1 lot for a consideration of $350.00
1944 -
1 sale of 2 lots for a consideration of
$200.00
Lawrence T. Beck was petitioner's son-in-law, and since 1940 *80 has managed petitioner's property for her, for which services petitioner paid a fee. Prior to that time such services were performed by a former employee of petitioner's husband. Lawrence T. Beck & Co. is a partnership presently composed of Beck and his wife, petitioner's daughter, engaged in work as consulting engineers. During the years 1942, 1943, and 1944, petitioner paid Lawrence T. Beck & Co. management fees for looking after her property in the respective amounts of $4,517.43, $4,500, and $4,500. Neither petitioner nor her son-in-law had a real estate office or license. Lawrence T. Beck & Co. had an office in Dallas, Texas, which was in charge of Winnie McLain, its secretary and bookkeeper. Winnie McLain was custodian of petitioner's books and familiar with her properties. The Dallas office transacted business for petitioner but referred everything to Beck. As a result of conferences held by Beck with the Federal Housing Administration, in order to make the property more attractive and suitable for Federal loans and insure the value of whatever portion of the subdivision might remain with petitioner, an architect was engaged to prepare initial plans which would indicate *81 the basic type of residence in keeping with the ideals of development of the property, the Lumber Company was selected as suitable developers and over-all control of the development was retained. In 1940 petitioner paid $496 for these architectural services. She also paid $633.77 for the above-mentioned survey of the property. The conferences with the Federal Housing Administration preceded the execution of the contract with the Lumber Company. Petitioner purchased two or three lots in Trinity Heights for the purpose of rounding out the subdivision in order to permit the sale of the property in bulk. At the time of the hearing the Trinity Heights property had been substantially disposed of in bulk. In 1927, Phillip Loewenberg purchased with community funds 455 acres of land in Arkansas, which included 175 acres of timber land at a cost of $9,099.72. There were no sales from this property prior to Phillip Loewenberg's death in 1933. At this time his one-half interest in the Arkansas property was valued at $2,250 for estate tax purposes. In 1942 petitioner sold 175 acres of timber for $4,264.30. Its cost is $9 per acre, or a total of $1,575. In her returns petitioner treated *82 the gains from the sale of Trinity Heights property as capital gains. Respondent, in his determination of the deficiency, treated such gains as ordinary income. Opinion A number of tests have been employed to determine whether real property composed of lots in a subdivision is a capital asset within the meaning of section 117 (a), Internal Revenue Code, [2] so as to give rise only to capital gain upon disposition. Generally speaking, they turn upon the quality and scope of the taxpayer's activity in handling the property; that is, in inferring whether property is presently and prospectively "held * * * primarily for sale to customers in the ordinary course of his trade or business," the courts look to his past conduct with respect to the acquisition, exploitation, and disposition of the property. *83 Thus, in McFaddin v. Commissioner (C.C.A., 5th Cir.), 148 Fed. (2d) 570, "unimproved lands were acquired for the specific purpose of development into a subdivision and sale by the taxpayer," see Fahs v. Crawford (C.C.A., 5th Cir.), 161 Fed. (2d) 315, and it was held they were not capital assets. In Ehrman v. Commissioner (C.C.A., 9th Cir.), 120 Fed. (2d) 607, where the same result was reached, there was "substantial sales activity," see Frieda E. J. Farley, 7 T.C. 198. In Harriss v. Commissioner (C.C.A., 2nd Cir.), 143 Fed. (2d) 279, the result is said to depend "upon the number and the proximity of the purchases and sales to one another." And the "so-called liquidation test," while not conclusive, "is not * * * to be disregarded," where "development and sales activities are absent." Frieda E. J. Farley, supra. Judged by any of these standards, or all combined, petitioner's activities were not sufficient to constitute a holding primarily for sale to customers in the ordinary course of business. The original acquisition was even more involuntary than in Frieda E. J. Farley, supra, or Fahs v. Crawford, supra, *84 since petitioner's ownership was the result of foreclosure. She undertook no affirmative steps toward subdivision or sale directly, or through employees. The property was already subdivided when she acquired it, as in the Farley and Crawford cases, and, as in those cases, sales were made only as a result of the initiative of the purchasers. She contributed less in activity or expenditure than the taxpayers in either of the cited cases, and her contract with the builder was smaller in scope and contemplated less participation on her part than that involved in Fahs v. Crawford, supra.
The number of sales made from acquisition to the end of the year before us was a negligible percentage of the total, and the interval between sales averaged months, and at times was over a year. The objective of liquidation by a sale in bulk is apparent from the uncontradicted evidence of contemporary purpose, and if we are permitted to look beyond the instant year, is confirmed by the ultimate action taken. Upon all of the facts we entertain no doubt that the property in question constituted a capital asset within the legislative meaning. Frieda E. J. Farley, supra; Fahs v. Crawford, supra. *85 Decision will be entered under Rule 50. Footnotes
1. 1942 is pertinent by reason of the Current Tax Payment Act.↩
2. "(a) Definitions. - As used in this chapter - "(1) Capital Assets. - The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer;"↩