### PALOS VERDES CORP. v. UNITED STATES.

#### No. 13116.

United States Court of Appeals Ninth Circuit.
Dec. 26, 1952.

Riley & Hall and William D. Behnke, Los Angeles, Cal., for appellant.

Charles S. Lyon, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott and Carolyn R. Just, Sp. Assts. to Atty. Gen., Walter S. Binns, U. S. Atty., and Frank W. Mahoney, Sp. Atty., BIR., Los Angeles, Cal., for appellee.

Before STEPHENS, and ORR, Circuit Judges, and McCORMICK, District Judge.

STEPHENS, Circuit Judge.

In 1913 a syndicate purchased 16,004 acres of unimproved land commonly known as Rancho Palos Verdes. The property consists of the semi-arid hump of land or foothill lying westerly of San Pedro and Wilmington in Los Angeles County, California, about twenty-five miles south of the main business section of Los Angeles City. The hump slopes off rather gradually from around 1400 feet above sea level southerly and westerly to high, bold bluffs at the sea's edge, and northerly to the plain leveling off toward the center of Los Angeles City. The Rancho contains little level land and is cut by many arroyos and small, rough canyons. Until the early nineteen-hundreds, the area was of little use except for seasonal grazing.

In 1913 the growth of Southern California, inclusive of the metropolitan district of the City of Los Angeles and its sea ports at San Pedro and Wilmington, attracted Mr. Frank Vanderlip and associates to the large area of the Rancho. The evidence is sketchy as to whether it was purchased as an investment or for development and sale.

In 1925 the syndicate in effect was changed into a Delaware corporation, taking deed to 12,245 acres of the Rancho. The corporation was given the power to deal in real estate.

In 1923, the syndicate negotiated the sale of the entire holding, but consummation was prevented by the lack of money, and only two portions of it were sold: 3,000 acres in the northwesterly part near the Redondo edge, and 200 acres in the southeasterly edge near the port of San Pedro. These two portions were subdivided by the new owners and neither the corporation nor the syndicate had any interest in them or in the subdivision.

Part of the land was farmed, and some diatomaceous earth and granite stone were taken from the land and sold, but the total income was less than the sum of the taxes. The corporation endeavored to sell the holding, and considered subdividing it as a whole, but neither was ever brought about.

The details of the corporation business were handled by a corporate vice president who acted as general manager. The general manager possessed a real estate broker's license and he and other brokers made sales of acreage from the whole and received commissions therefor. However, the property was not listed for sale with independent brokers and no "For Sale" signs were put on the land except upon the land comprising "Rolling Hills" subdivision. We shall hereinafter refer to "Rolling Hills" by quoting the district court's finding "X".

No improvements on the acreage were made except for roads connecting the farms and irrigation lines for the farming lands. During the period of its corporate existence, the corporation has neither bought nor sold real estate except as to the Rancho land, nor had it acted as a broker or as a development company in any other connection. The corporation, from its inception endeavored to sell its entire holding or portions thereof, by means of leaflets and brochures, and by the mailing of over 10,000 postal cards. All of the sales were reported to the revenue collector as business of real estate.

Among the court's findings of fact, and there is no contention that any of the findings is not supported by the evidence, are the following:

"X.

"That the plaintiff subdivided part of its land and offered the same for home sites and called said section "Rolling Hills" [a tract of about 600 acres]; and that prior to the actual subdivision of this parcel within the meaning of state and county laws, the plaintiff

**258**

sold portions of this section as acreage for residential purposes."

"XVI.

"That plaintiff sold during the fiscal year ended September 30, 1944, both subdivided land and unsubdivided portions of its property, and that sales of its unsubdivided portions greatly exceeded in number its subdivision sales."

'XVII.

"That during the fiscal year ended September 30, 1944, the plaintiff in addition to the Snow sale [Finding III] made 34 other sales of unsubdivided land totalling 531.859 acres and reported these sales as ordinary income."

"XIX.

"That although plaintiff made 34 additional sales of unsubdivided property in the fiscal year ending September 20, 1944, which were reported as ordinary income, it has not at any time contended that this acreage represented a capital asset."

III. (Abbreviated and not quoted)

In July, 1944, plaintiff sold to Mrs. Snow 422.56 acres from the Rancho and contiguous to the Rolling Hills subdivision, for $90,000. The cost basis was $23,636.93, the profit being $66,-363.07, and during the fiscal year from October 1, 1943 and ending September 30, 1944, plaintiff received on account the sum of $27,000. (Reported as installment pursuant to Section 44 (b) of the Internal Revenue Code [26 U.S.C.A. § 44(b)].

In relation to the Snow sale, the corporation paid its October 1943-September 30, 1944 Income and Declared Value Excess-Profits Tax in the sum of $17,066.36 on the basis of doing a real estate business, and later filed its claim for $5,467.88 as overpayment on the ground that the gain realized was derived from the sale of either a capital asset by a corporation, § 117(a) (10), Internal Revenue Code, 26 U.S.C.A. § 117(a) (10), or of real property used in trade or business, § 117(j), Internal Revenue Code. The commissioner denied the

claim, holding that the payment had been made on the correct basis. Suit followed, resulting in the district court's upholding the commissioner's view, and this appeal by taxpayer was made.

The question for decision is whether the facts support the conclusion of law and judgment that the property was held primarily for sale to customers in the ordinary course of trade or business, § 117(j)(1) (B), Internal Revenue Code.

■■ It is sound law that holding an asset for many years indicates an intention to hold for investment, rather than for sale, The Merchants Nat'l Bank of Mobile v. Commissioner, 1950, 14 T.C. 1375, 1379, and the long period of holding assets without being disposed of violates the concept of an organized business with respect thereto. Mackall v. Commissioner, 1944, 3 T.C.M. 701; see also Loewenberg v. Commissioner, 1948, 7 T.C.M. 702. And as was said in Harriss v. Commissioner, 2 Cir., 1944, 143 F.2d 279, 280–281, "A hope, when a purchase is made, that the property acquired [or a holding thereafter, we assume] may at some later time be sold at a profit, will not transmute a long time investment in land * * * into a business of buying and selling real estate, or change a capital transaction into an ordinary business profit or loss."

On the other hand, whether appellant desired to be in the "business or trade" but was driven to sell numerous parcels because of taxes and the failure to sell the land in bulk, or was selling it piece-meal as the only practical way to get rid of it, does not fix the tax-wise status of the sales. Ehrman v. Commissioner, 9 Cir., 1941, 120 F.2d 607; Commissioner v. Boeing, 9 Cir., 1939, 106 F.2d 305. In Guthrie v. Jones, D.C.Okl.1947, 72 F.Supp. 784–785, the court mentions with supporting citations certain conditions of importance in determining the question. They are: "the regularity and continuity of sales"; "the nature and extent of taxpayer's 'business' "; "the activity of the taxpayer in promoting the sales".

■ We have heretofore decided that a mere series of sales for the primary pur-

pose of liquidation does not solve the problem. Ehrman v. Commissioner, supra. The holder may well have acquired and held the property for an ordinary turnover profit and found that it could not be sold for a reasonable price without submitting it to conditions prevalent to a trade or business. In such case the owner has changed the status of his holding, whether or not it was contrary to his first desire.

In the instant case, the owner would have sold the entire holding in one or several transactions, but finding such method of disposal impractical, announced to the public in various ways that acreage in the Rancho was for sale and proceeded to solicit and make numerous sales, and in one instance subdivided 600 acres of the ranch and actively pressed for and made sales of tracts within the subdivision.

The evidence indicates to us that the owner was not in the real estate business by choice, but because it offered the way to dispose of the property which, to use an old expression, "was eating its head off" through expenses of holding it. The owner did, however, resort to a method of disposal which in fact required that the property be submitted to customers in the ordinary course of trade or business of real estate.

Considering the nature of the property and its restricted use—that of acreage country estates—sales were reasonably continuous except for the period of the great depression. There is evidence that the nature of appellant's activities was ownership of a large tract of real estate held for sale. There is evidence of continuous effort to sell in several ways: in one subdivision of its own; in other subdivisions sold by appellant for subdivision into acreage estates; and the total holding in part or as a whole.

We are of the opinion that it was not error for the trial court to decide that appellant held the real estate involved primarily for sale to customers in the ordinary course of trade or business during the pertinent period of this case. The judgment is affirmed.

Affirmed.