Floyd L. Freberg and Kathryn B. Freberg v. Commissioner.
Freberg v. Commissioner
Docket No. 1026-63.
United States Tax Court
T.C. Memo 1964-129; 1964 Tax Ct. Memo LEXIS 207; 23 T.C.M. (CCH) 784; T.C.M. (RIA) 64129; May 7, 1964
Frank C. Scott, P.O. Box 1904, Stockton, Calif., for the petitioners. Roger A. Pott, for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of petitioners in the amounts of $12,823.38 for 1959 and $2,344.75 for 1960. The sole issue is whether gain realized by petitioners from the sale of parcels of real property during the years 1959 and 1960 is taxable as ordinary income or capital *208 gain. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. During the years 1959 and 1960, petitioners, husband and wife, resided in Yuba City, Sutter County, California. They filed joint income tax returns for those years with the district director of internal revenue at San Francisco. In 1944, petitioners, then residents of Gustine, Merced County, California, purchased approximately 30 acres of land in Sutter County, California, for $10,500. Approximately 20 acres of this land were improved by a walnut grove, and the remainder was bare arable land. In 1946 petitioners sold from their 30 acres approximately 8.25 acres of land, none of which was planted in walnut trees, to a neighboring land owner. In 1954 they sold two lots each 100 X 150 feet, and deeded a portion of land between the lots, 60 X 100 feet, to Sutter County for purposes of a street (0.8264 acres in all). From 1944 until 1952 petitioners commuted from Gustine to Yuba City on weekends and during vacations to operate the walnut farm. They moved to Yuba City in 1952, and from 1952 through 1960 Floyd $ Freberg was employed by the local walnut association *209 as an accountant. When they purchased the 30-acre tract in 1944, it was "out in the country". By 1955, the portion of the tract then owned by them was in a populated area. Sutter County prohibited the use of poisonous insecticide sprays in populated areas, and petitioners had to discontinue the use of such sprays on their walnut trees. The operation of the walnut farm under the conditions then existing was beginning to be "a little bit of a problem" and petitioners decided to subdivide and sell the property. They continued to operate the walnut farm "to a certain extent" during the years 1955 through 1960, and realized some income from the sale of walnuts. On April 1, 1955, petitioners, as Parties of the First Part, entered into an agreement with Leonard B. Stafford and Lavonne Stafford, his wife, as Parties of the Second Part, providing for the subdivision of approximately 20 acres of the petitioners' property. Stafford had previously had some experience in subdividing, developing and promoting the sale of real property. The agreement provided, in part, as follows: WHEREAS, Parties of the First Part with the assistance of Parties of the Second Part intend to subdivide approximately *210 twenty (20) acres of land in Sutter County, California, owned by Parties of the First Part and such subdivisions to be designated as Hillcrest Terrace Nos. 3, 4 and 5 each in subdivision blocks of approximately equal proportions, and WHEREAS, the Parties of the Second Part intend to advance the necessary funds for mapping and developing said subdivisions, which advancements are now estimated by the parties to amount to the sum of $13,000.00 as to the first of such subdivisions and $10,000.00 total as to the other two subdivisions: NOW, THEREFORE, IT IS AGREED BETWEEN THE PARTIES FOR THE ACCOMPLISHMENT OF THE ABOVE PURPOSES AS FOLLOWS: Parties of the First Part and Parties of the Second Part shall proceed with the plans for the development of the subdivisions before mentioned and in that connection it shall be the duty of the Parties of the First Part to sign all documents, maps, restrictions and applications necessary to accomplish such purpose. Parties of the First Part shall give to the Parties of the Second Part a Deed of Trust on the first subdivision tract to secure the payments due to Parties of the Second Part hereunder in the amount of $13,000.00 payable on or before *211 ten (10) years from this date without interest and on the other subdivisions as and when they are agreed upon an additional deed of trust shall be given by Parties of the First Part to Parties of the Second Part to secure the advances for each. It shall be the obligation of the Parties of the First Part to furnish good title to all of such subdivision land and it shall be the duty of the Parties of the Second Part to process all applications in connection with said proposed subdivisions to the satisfactory approval thereof by the County, State and Federal agencies as shall be desired by the parties. All advancement made by the Parties of the Second Part hereunder shall be returned to them in cash as follows: From the first sale of lots in said subdivisions, one-half of the advancement shall first be returned to the Parties of the Second Part plus ten percent (10%) of the gross sales price of all lots sold, which ten percent (10%) of all lots sold shall be the compensation due to the Parties of the Second Part for their assistance in promotion and sales of said subdivision property. After one-half of said advancements have been paid Parties of the Second Part shall receive a minimum *212 of $500.00 from each lot sold until the advancements have been repaid to them in full plus ten per cent (10%) of the gross sales price of each lot in said subdivisions and after all advancements are paid the Parties of the Second Part shall receive ten per cent (10%) on all gross sales of lots in said proposed subdivision in consideration of their services. It is agreed by the Parties of the Second Part that as and when lots are sold from said subdivisions they shall execute partial reconveyances for the particular lots as sold in order to affect release of the deed of trust hereinbefore mentioned. The note balance due Parties of the Second Part shall be left at a minimum of $100.00 until the last lot in each subdivision shall be sold. Parties hereto agree that any advances may by Parties of the Second Part shall be deposited in a joint checking account by the parties in The First Western Bank at Marysville, California, and that all checks against said account shall be signed by at least one of each of the parties. The parties agree as to prices and terms of the lots of said subdivisions they will from time to time reach a mutual agreement thereon and if the parties are unable *213 to agree upon the sales price they agree that they will arbitrate the proposed sales price in the following manner: * * *
It is agreed that all improvement work will be submitted to contractors on a bid basis and that the parties will accept the lowest and best bid for such work. The parties each agree that they will hereafter execute all documents and maps necessary to accomplish the purposes herein contemplated and this agreement shall continue until all lots in said proposed subdivisions shall have been sold. * * *
In 1955 and 1956 petitioners subdivided 7.5 acres known as Highland Estates into 16 lots. Improvements were made to the subdivision and all of the 16 lots were sold in the years 1955 through 1957. The April 1, 1955 agreement was amended on December 22, 1958 to include that portion of the 20 acres not previously subdivided. In the amendment petitioners agreed to give the Staffords a deed of trust on the property to be subdivided in the amount of $22,000, and the terms of repayment of moneys advanced by the Staffords were changed to provide that the Staffords would receive the first $5,000 of sales proceeds, then half of the sales proceeds until one-half *214 of the amounts advanced by them had been repaid, and thereafter $1,000 per lot until $100 remained unpaid. In late 1958 petitioners subdivided 12.09 acres known as Highland Estates No. 2 into 30 lots. The subdivision was improved, and 21 lots were sold in 1959, 3 in 1960 and 6 in 1961. The adjusted cost basis of the Highland Estates No. 2 acreage was $3,350 prior to the subdivision. Petitioners made expenditures to improve the subdivided property, the cost of which was as follows: Engineering
$ 2,842.27
Curbs, Gutters, Roads
(Grading and Surfacing)
13,818.85
Drainage System Installa-
tion
4,489.99
Total Cost of Improvements
$21,151.11
Other: Clearing Water Disposal
Eastement
$ 605.82
Miscellaneous and Legal
183.68
Total
789.50
Adjusted Cost Basis of Land
3,350.00
Total Adjusted Basis Prior to Sale
$25,290.61
The income of petitioners for the years 1954 through 1960, as reported by them in their income tax returns, was as follows: ,year
Net Farm
Salary
Capital Gain
Other
Total
1954
$1,627.20
$4,400.00
$ 879.00
None
$ 6,906.20
1955
2,443.22
4,871.64
13,569.48
$ (32.24)
20,852.10
1956
2,531.55
4,982.92
1,285.21
558.87
9,358.55
1957
431.00
4,982.93
1,682.96
595.65
7,692.54
1958
549.00
5,100.00
453.96
408.04
6,511.00
1959
513.58
5,547.93
23,753.85
456.36
30,271.72
1960
564.30
5,400.00
7,544.56
1,205.52
14,714.38
*215 Respondent determined that the lots sold by petitioners in 1959 and 1960 represented property held by them primarily for sale to customers in the course of their trade or business and that the profit realized from the sale of such lots, $47,537.88 in 1959 and $14,980.12 in 1960, was taxable as ordinary income. During the years 1959 and 1960 petitioners held their land in Sutter County primarily for sale to customers in the ordinary course of their trade or business. Opinion RAUM, Judge: Petitioners contend that the lots sold by them in 1959 and 1960 were property used by them in their trade or business of operating a walnut farm, and that under the provisions of Section 1231 of the Internal Revenue Code of 1954[1] the profit realized by them on such sales represented gain from sales of capital assets only one-half of which was includable in their gross income. They urge that there can be no doubt that their purpose in acquiring the property in 1944 was to engage in the business of operating a walnut farm and that they continued to operate it for that purpose up to 1955; that they derived a profit from this business up to and beyond the year 1955; that *216 in these circumstances it would be unreasonable to assume a change either in 1955 or subsequently to a holding of the property by them primarily for sale to customers in any business of selling residential lots imputable to them; that their participation in the subdivision and sales activities was a passive one consisting to a large degree merely of approval of, and signing, deeds and other documents; and that Stafford by reason of his investment of funds in the subdivisions and his say in fixing prices was acting more as a principal in a joint venture than as agent for them. *217 Under the provisions of Section 1231, supra, and Section 1221(1) [2] of the 1954 Code the land owned by petitioners which was subdivided into lots in 1958 and sold in 1959 and 1960 does not qualify as a capital asset if it was held by them primarily for sale to customers in the ordinary course of their trade or business.[3] Whether it was so held is essentially a question of fact. In the numerous instances in which this question has been considered by this and other courts certain factors have been recognized as helpful guides in reaching the correct result. Among them are the purposes for which the property was acquired; frequency and continuity of sales as opposed to casual sales; and the activity of the seller or those acting for him in making improvements to the property. See Kelley v. Commissioner, 281 F. 2d 527, 529 (C.A. 9); Pool v. Commissioner, 251 F. 2d 233, 235 (C.A. 9), certiorari denied, 356 U.S. 938; Stockton Harbor Industrial Co. v. Commissioner, 216 F. 2d 638, 650 (C.A. 9); Palos Verdes Corp. v. United States, 201 F. 2d 256, 258 (C.A. 9); Home Co., Inc. v. Commissioner, 212 F. 2d 637, 639 *218 (C.A. 10).
We agree with petitioners that they acquired the 30-acre tract in 1944 for the purpose of operating a walnut farm thereon, and that they held the property primarily for that purpose prior to 1955, the year in which they decided to subdivide it. We do not agree that they continued to hold that property primarily for that purpose in 1955 and subsequent years. The evidence discloses that early in 1955 petitioners experienced difficulty in the operation of their farm because property adjacent to it had become populated and they had to discontinue *219 spraying their walnut trees. They then decided to subdivide their land into lots and sell them. They made substantial expenditures for curbs, gutters, roads, and a drainage system to prepare the land for sale which amounted to approximately seven times the adjusted cost basis of the acreage. During the years 1955 through 1960, 40 of the 46 lots in the subdivided land were sold, 21 in 1959 and 3 in 1960. While it is true, as alleged by petitioners in their amended petition and admitted by respondent in his answer, that Stafford acted as their agent in subdividing the property and making the sales, it is well settled that persons may engage in business through an agent and the activities of the agent for their benefit will be imputed to them. Kelley v. Commissioner, 281 F. 2d 527, 529 (C.A. 9); Achong v. Commissioner, 246 F. 2d 445, 447 (C.A. 9); Kaltreider v. Commissioner, 255 F. 2d 833, 838 (C.A. 3); Gamble v. Commissioner, 242 F. 2d 586, 592 (C.A. 5). Viewed in this light there is no merit to petitioners' contention that their participation in the subdivision and sale activities was merely a passive one. The land they decided *220 to subdivide and sell was their land; they made substantial improvements to prepare it for sale; acting through their agent they subdivided the land and sold lots; they participated in fixing the sales price for each lot; the lot sales were frequent and continuous; and they signed the deeds given to the purchasers. They were therefore engaged in the trade or business of selling real estate. Although they also continued during the years 1955 through 1960 to sell some walnuts grown on portions of the property that had not been sold, in diminishing quantities as shown in the stipulation of facts, it is apparent from the evidence that the land was not being held during those years primarily to engage in that business activity. The fact that some receipts were obtained through agricultural activities pending the final disposition of the property through the sale of lots does not change the conclusion that it was being held primarily for sale to customers. Stockton Harbor Industrial Co. v. Commissioner, 216 F. 2d 638, 655-656 (C.A. 9). The evidence convinces us, and we have found as a fact, that during 1959 and 1960 the land was held by petitioners primarily for sale to customers *221 in the course of their real estate business. In the circumstances the respondent did not err in determining that the gain realized by petitioners from the sale of lots in those years was taxable as ordinary income and not as capital gain. Cf. Kelley v. Commissioner, 281 F. 2d 527 (C.A. 9). Decision will be entered for the respondent. Footnotes
1. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * * (b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - * * *
(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or * * *↩
2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. ↩
3. Petitioners concede on brief that the lots sold by them in 1959 and 1960 do not meet the requirements set forth in Section 1237 of the 1954 Code for property which "shall not be deemed to be held primarily for sale to customers in the ordinary course of trade or business at the time of sale * * *."↩