Edward **POOL** and Lottie Pool, Edward Pool, Lottie Pool, William K. Murphy, Edna Murphy, William K. Murphy and Edna Murphy, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 15399.

United States Court of Appeals Ninth Circuit.

Dec. 18, 1957.

Irving I. Axelrod, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for petitioners.

Charles K. Rice, Asst. Atty. Gen., S. Dee Hanson, Ellis N. Slack, A. F. Prescott, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before LEMMON and BARNES, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

In this review of the determination of income tax deficiencies against the taxpayers for the calendar years 1946,

1947 and 1948, six consolidated cases are involved. The decisions of the Tax Court were entered on August 20, 1956. The deficiencies were as follows:

| | |
|---|---:|
| For the years 1946–1947 Edward Pool | 5,697.02 |
| | 86,828.50 |
| For the years 1946–1947 Lottie Pool | 5,697.02 |
| | 86,828.50 |
| For the year 1948 Edward and Lottie Pool | 18,651.22 |
| For the years 1946–1947 William K. Murphy | 3,410.79 |
| | 98,401.48 |
| For the years 1946–1947 Edna Murphy | 3,410.79 |
| | 98,401.48 |
| For the year 1948 William K. and Edna Murphy | 17,349.60 |

It is the contention of the taxpayers that the decisions are clearly erroneous and should be set aside.[1] It is also argued that these are cases in which the Tax Court misapplied the law to proved facts.[2] In the main, it is asserted that the Tax Court erred in treating the income derived from the sales of two sets of duplexes owned by the petitioners as ordinary income under Section 22 of the Internal Revenue Code of 1939.[3] To the contrary, it is insisted that the sales should have been treated as the liquidation of an investment and the income subjected to the tax called for by the capital gain provision of Section 117(j) of the Internal Revenue Code of 1939.[4]

## I

### The Criteria Under 117(j)

Cases of this character present difficulties because there is no agreement among the courts as to what primary element in the transaction determines its character. In a recent case this Court, after enumerating some of the elements which the various Courts of Appeals have considered, at times, determinative, states the conclusion that, in the last analysis, the question is one of fact:

"What is and what is not trade or business and when property is or is not held for sale to customers are questions of fact.

"Provisions similar to the one under discussion have been part of our tax statutes for many years. Courts have sought to evolve criteria by which to determine whether a person or an association was engaged in business. More particularly, they have tried to establish criteria by which to determine whether real property is held for investment or sale to customers in the ordinary course of business. Many tests have been proposed by this and other courts. Among them are: (1) the nature of the acquisition of the property, (2) frequency and continuity of sales over a period of time, (3) the nature and extent of the taxpayer's business, (4) the activity of the seller about the property, such as the extent of his improvements or his activity in promoting sales, (5) the extent and substantiality of the transaction and the like. * * * But in the last analysis, each case must be determined upon its own specific facts,,

---

1. 26 U.S.C., 1952 Ed., § 1141(a) and (c); I.R.C., 1954, § 7482(a) and (c) (1), 26 U.S.C. § 7482(a), (c) (1); Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.

2. McGah v. Commissioner, 9 Cir., 1954, 210 F.2d 769, 771–772; Earle v. Woodlaw, 9 Cir., 1957, 245 F.2d 119, 126–128.

3. 26 U.S.C., 1952 Ed., § 22.

4. 26 U.S.C., 1952 Ed., § 117(j) (1) (A); Treasury Regulation 111, § 29.117–1.

for none of these incidences are present in all cases." [5]

Cases, old and new, in this Circuit have, at times, emphasized one or another of these criteria. Thus, in a case preceding the one just cited, this Court said:

"We have heretofore decided that a mere series of sales for the primary purpose of liquidation does not solve the problem. Ehrman v. Commissioner, supra, [9 Cir., 120 F.2d 607]. The holder may well have acquired and held the property for an ordinary turnover profit and found that it could not be sold for a reasonable price without submitting it to conditions prevalent to a trade or business. In such *case the owner has changed the status of his hold-ing, whether or not it was contrary to his first desire*." [6] (Emphasis added.)

This and other courts have stated repeatedly that "there is no fixed formula or rule of thumb" [7] for determining whether property is held primarily for sale to customers in the ordinary course of the taxpayer's business. The reason is that the problem usually arises in

"situations where the taxpayer is engaged in some activity apart from his usual occupation and the question is whether this activity amounts to a business." [8]

Even the management of one's own property may or may not be "a business" depending on circumstances.[9] And in

5. Stockton Harbor Industrial Co. v. Commissioner, 9 Cir., 1954, 216 F.2d 638, 650. In another case the factors to be taken into consideration are stated to be: " * * * the frequency and continuity of sales; the purpose for which the property was originally built; whether there was a bona fide change from the original purpose of building houses for sale; the extent and substantiality of the sales income as compared to the rental income earned by the company. These are factors commonly considered by other courts in making such a determination. See Victory Housing No. 2 v. Commissioner, 10 Cir., 1953, 205 F.2d 371; Mauldin v. Commissioner, 10 Cir., 195 F.2d 714, supra; Commissioner of Internal Revenue v. Boeing, [9 Cir.,] 106 F.2d 305, supra. None of the factors stated above was cited as being controlling but all were considered by the Tax Court." Cohn v. Commissioner, 9 Cir., 1955, 226 F.2d 22, 24.

6. Palos Verdes Corp. v. United States, 9 Cir., 1952, 201 F.2d 256, 258–259. As stated in Rollingwood Corp. v. Commissioner, 9 Cir., 1951, 190 F.2d 263, 266: "While the purpose for which the property was acquired is of some weight *the ultimate question is the purpose for which the property is held*." (Emphasis added.) The line of cases in which this Court has refused to consider liquidation, either directly or through agents, as determinative of the matter, is unbroken: Richards v. Commissioner, 9 Cir., 1936, 81 F.2d 369, 372–373; C. I. R.

v. Boeing, 9 Cir., 1939, 106 F.2d 305, 309; Ehrman v. Commissioner, 9 Cir., 1941, 120 F.2d 607, 610; Rollingwood Corp. v. Commissioner, 9 Cir., 1951, 190 F. 2d 263, 266; Cohn v. Commissioner, 9 Cir., 1955, 226 F.2d 22, 24; Achong v. Commissioner, 9 Cir., 1957, 246 F.2d 445, 447. In the light of this, the seemingly contrary conclusion reached by the Court of Appeals for the Third Circuit in Curtis Co. v. Commissioner, 1956, 232 F.2d 167, loses significance. The strong dissent by Circuit Judge McLaughlin stresses the fact that the majority opinion is contrary to the decisions of this court. Richards v. Commissioner, supra; Rollingwood Corp. v. Commissioner, supra; and Cohn v. Commissioner, supra, are cited as stating the correct principle that "that manner and purpose of holding property may change or be twofold" (232 F.2d at page 172). And this Court in Achong v. Commissioner, supra, distinguishes the Curtis case because "the sales were of homes previously owned for rental without any change to facilitate sale." (246 F.2d at page 447)

7. Mauldin v. Commissioner, 10 Cir., 1952, 195 F.2d 714, 716; Cohn v. Commissioner, 9 Cir., 1955, 226 F.2d 22, 24; Pacific Homes, Inc., v. United States, 9 Cir., 1956, 230 F.2d 755, 759.

8. Rollingwood Corp. v. Commissioner, supra, 190 F.2d at page 266, note 6.

9. Higgins v. Commissioner, 1941, 312 U.S. 212, 218, 61 S.Ct. 475, 85 L.Ed. 783. See, Lykes v. U. S., 1951, 343 U.S. 118

dealing with the sale of lands the applicable rule has been well summed up by the Court of Appeals for the Fifth Circuit:

"An occasional sale of land held as an investment is not such a business though profit results. The word, notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation. It need not be one's sole occupation, nor take all his time. It may be only seasonal, and not active the year round. It ordinarily is implied that one's own attention and effort are involved, but the maxim qui facit per alium facit per se applies, and one may carry on a business through agents whom he supervises." [10]

And Courts of Appeals, including this one, have warned that, in the end, the decision in each case must depend upon the particular facts in the case.[11] The Court of Appeals for the Tenth Circuit expressing itself in accord with this view has stated:

"Neither is it possible in the resolution of these questions to adopt fixed indices from which the answer can be reached. There are, however, certain factors which have been recognized as helpful guides in seeking a just and correct result. Among these are the purposes for which the property was acquired, the activities of the taxpayer and his agents with respect thereto such as making improvements on the property, conducting a sales campaign either through advertisements or the employment of real estate agents, the frequency and continuity of sales as differentiated from isolated sales, as well as any other factor reasonably tending to show that the transaction was in furtherance of or in the course of the taxpayer's occupation or business." [12]

These warnings are significant because the taxpayers in this case would have us abandon the flexible formulas which Courts have established in favor of a rigid formula that *"would fit"* the variety of cases which has arisen. Thus, they would place in one group cases in which the original intention is obscure.[13] In another group they would include cases in which the character of the property was changed.[14] In the third group they would gather cases where there is an original investment purpose and a later decision to sell.[15] The taxpayers urge that the present case is in the latter group and that the Tax Court erred in not so ruling.

■■ It is not necessary for us to determine the validity of the rigorous distinctions which the taxpayers have sought to introduce into the cases which have dealt with the problem. What they have done is the very thing against which this and other courts have warned. They have taken one or another of the criteria which have been resorted to and sought to *enshrine it as a rigid category.* The teachings of the cases is that this cannot and should not be done. The excellence of our jurisprudence is its

121–122, 72 S.Ct. 585, 96 L.Ed. 791, for legislative change as to deductibility of certain expenditures since the decision was made. The concept of what is business is not changed.

10. Snell v. Commissioner, 5 Cir., 1938, 97 F.2d 891, 892.

11. See cases cited in Note 7.

12. Home Co. v. Commissioner, 10 Cir., 1954, 212 F.2d 637, 639. And see, Mauldin v. Commissioner, supra, note 7.

13. Rollingwood Corp. v. Commissioner, supra, note 6; Cohn v. Commissioner, supra, note 6; Homann v. Commissioner, 9 Cir., 1956, 230 F.2d 671.

14. C. I. R. v. Boeing, supra, note 6; Richards v. Commissioner, supra, note 6; Erhman v. Commissioner, supra, note 6.

15. Chandler v. United States, 7 Cir., 1955, 226 F.2d 403; Curtis Co. v. Commissioner, 3 Cir., 1956, 232 F.2d 167, which is commented on in note 6; Victory Housing No. 2 v. Commissioner, 10 Cir., 1953, 205 F.2d 371.

flexibility. In applying general statutory language to particular situations, courts best conform to the tradition of growth of our system when they adapt realistically general principles to different or constantly changing situations. In applying tax statutes, the best result is always achieved when we avoid harsh crystallizations.

## II

### The Undisputed Facts in the Case

If we apply the criteria referred to above [16] to the situation before us, we cannot say that the decision of the Tax Court was clearly erroneous.[17] Nor are we convinced that the Tax Court applied the wrong principles of law to admitted facts.[18]

### 1. Stipulated Facts.

In determining the matter it is necessary to go, with some detail, into the background out of which the controversy arises. Many of the facts were not disputed. In outline, the following facts were stipulated. They are given (with some omissions and changes of language) in the form in which they appear in the stipulations.

Edward Pool and Lottie Pool are husband and wife. At all times herein material, they filed their federal income tax returns on a cash and calendar year basis with the Collector of Internal Revenue for the Sixth District of California. Separate returns were filed for the years 1946 and 1947 but joint returns were filed for the year 1948.

William K. and Edna Murphy are husband and wife. At all times herein material, they filed their returns on a cash and calendar year basis with the Collector of Internal Revenue for the Sixth District of California. In 1946 and 1947 each filed separate returns. In 1948, however, they filed joint returns.

Artcraft Builders, Inc. (hereinafter referred to as "Artcraft") is a California corporation. Until 1944 its principal place of business was at Los Angeles, California. Since 1945 its principal place of business has been at Long Beach, California.

Artcraft was organized as a California corporation on March 10, 1941. Four thousand shares of Class A preferred stock and 21,000 shares of Class B Common stock were authorized. Class A and Class B stock were entitled to equal voting rights, share for share. The Class A shares carried the right to cumulative dividends at the rate of 8 per cent.

On incorporation, 800 of the Class A shares were issued to R. T. Cooke and Mary Cooke and the remaining 3,200 shares were issued to J. S. A. Smith and Gertrude C. Smith. The Class B shares were issued as follows: 200 shares to R. T. & Mary Cooke; 800 shares to J. S. A. and Gertrude C. Smith; 1,000 shares to Edward Pool; 1,000 shares to William K. Murphy.

In April, 1943, an additional 25,000 shares of Class B stock were authorized and issued as follows: Edward Pool, 8,-400; William K. Murphy, 8,300; J. S. A. Smith, 6,600; R. T. Cooke, 1,700.

On or about June 1, 1943, William K. Murphy and Edward Pool and their wives purchased all the stock held by Mr. and Mrs. J. S. A. Smith and Mr. and Mrs. R. T. Cooke. On June 8, 1943, Smith and Cooke resigned as officers and directors of Artcraft.

At all times thereafter the Pools and the Murphys have been the sole stockholders of Artcraft. From that date the Pools have owned 14,050 shares of the Class B stock as community property and the Murphys have owned 13,950 shares of Class B stock as community property. Each couple has from that time owned 2,000 shares of Class A stock as community property. The Pools paid a total of $16,000.00 for all their stock in Artcraft and the Murphys paid a total of $16,000.00 for theirs.

---

16. Stockton Harbor Industrial Co. v. Commissioner, supra, note 5; Pacific Homes v. United States, supra, note 7.

17. See references in Note 1.

18. See reference in Note 2.

In 1941, Artcraft constructed houses under individual building contracts for others. In 1942, Artcraft had some income from contracts with outsiders, but the major portion of its income was derived from building houses for sale on its own account. In 1942, Artcraft built for sale on its own account and sold 142 houses in Tract No. 12951, Los Angeles County. In 1943, Artcraft built for sale on its own account and sold 2 houses in Tract 12951, 86 houses in Tract 12287, and 100 houses in Tract 12288, all tracts being located in Los Angeles County, California. No income was derived by Artcraft in 1943 from building on contracts for others.

On May 26, 1943, Artcraft made application with the Federal Housing Administration and the War Production Board for approval to build 70 duplexes (containing 140 units) in Tract 11451. This application was approved by the Federal Housing Administration on June 7, 1943, and by the War Production Board on June 16, 1943. After construction, deeds to Lots 1 to 70, inclusive, of Tract 11451, with improvements, were executed by Artcraft and delivered on or about March 31, 1944, to Edward Pool, Lottie Pool, William K. Murphy and Edna M. Murphy, as tenants in common, the grantees acquiring an undivided one-fourth interest each. One hundred duplexes were constructed in Tract 13163, and deeds to Lots 1 to 100, inclusive, of that Tract, with improvements, were executed by Artcraft, bearing date of March 21, 1946, to W. K. Murphy, Edna Murphy, Edward Pool and Lottie Pool, as tenants in common, with grantees acquiring an undivided one-fourth interest each. The lots in these tracts, with improvements, were transferred to the four stockholders of Artcraft at cost to the corporation.

The four individuals, Edward Pool, Lottie Pool, William K. Murphy and Edna Murphy, on or about April 1, 1944, formed a joint venture (or partnership) known as "Edward Pool and Associates" (hereinafter referred to as "Associates"). Thereafter Associates kept its books on the accrual method and fiscal year basis ending January 31 of each year.

Both groups of units in Tracts 11451 and 13163 were rented after completion. Artcraft performed the role of rental agent for Associates for the period Associates owned the properties referred to. As such rental agent Artcraft entered into leases, collected rents, kept books, paid bills and generally managed the property.

All dwelling units here involved were subject to rent control during the taxable years. Permission was obtained for rentals charged from the proper governmental agency.

## 2. *Wartime Restrictions. Priority Assisted Housing.*

A proper understanding of the facts requires a brief summary of the wartime restrictions on housing and the requirements for approval by the Federal Housing Administration and by the War Production Board referred to in the stipulations.

General Orders 60–2 and 60–3 were part of the Operating Manual, National Housing Agency. General Order No. 60–2 was designated as "Public Regulations—Occupancy and Disposition of Private War Housing", while General Order No. 60–3 was designated as "Public Regulations—Methods of Disposition of Private War Housing Including Rent Levels, Sales Prices, and Petitions to the National Housing Agency."

General Order 60–2 recited that the National Housing Agency was responsible for the proper occupancy of housing programmed for war workers and for the adoption of regulations assuring that war housing would be available for eligible war workers for the duration of the national emergency declared by the President on September 8, 1939. Under it, private war housing was to be regarded as "begun" on the date of submitting to the Federal Housing Administration a properly executed application for priority assistance or authority to begin construction in connection with such hous-

ing, and the date of "completion" was to be the date upon which such housing was offered for initial rental or sale, or the date upon which it was first ready for immediate occupancy, whichever was later. The phrase "held for rental" was defined to include "only an ordinary landlord-tenant relationship or such a tenancy coupled with an option to purchase". Under the option, the tenant was not to be obligated to purchase and the option was to run only in his behalf. The selling price was to "be a fair market price, or $6,000", whichever was lower. The option to purchase could not be exercised prior to the expiration of four months' occupancy, and was to continue for at least 30 months, unless sooner exercised. Private war housing begun on or after February 10, 1943, was to be made available for initial occupancy, and for reoccupancy, only by eligible war workers. It was provided, however that at any time subsequent to 60 days after completion of such housing, the owner might petition the National Housing Agency to permit initial occupancy, or reoccupancy, as the case might be, by a person other than an eligible war worker. Except for involuntary transfers, private war housing could be disposed of (a) only to an occupant, after 4 months' occupancy; (b) to a person who would not himself occupy the housing, provided the occupancy and disposition limitations applicable prior to purchase or acquisition should continue to be applicable after such purchase or acquisition; or (c) at any time subsequent to 60 days after completion of any such housing, the owner might petition the National Housing Agency to permit disposition otherwise than as indicated in (a) and (b).

General Order 60-3 was intended to implement the occupancy and disposition policies of the National Housing Agency applicable to all private war housing as stated in General Order No. 60-2. It also provided that for the duration of the national emergency declared by the President on September 8, 1939, all private war housing begun on or after February 10, 1943, should be held for rental to eligible war workers as provided in General Order 60-2, at the rentals specified in the application, which rentals should in no event exceed $50 per month shelter rent for one unfurnished dwelling unit, plus a reasonable charge for tenant services, which was not to exceed $3 per month per room. It also embodied a provision that "a dwelling unit * * * may be purchased by an occupant (initial occupant or reoccupant) after four months of continuous occupancy". But that the purchase price could not exceed the fair market price, or $6000, whichever was lower. In the case of such sale, the seller was required to submit an agreement on the part of the purchaser that such purchaser would continue to occupy the dwelling unit, or would hold the unit subject to the occupancy and disposition provisions set forth in General Order No. 60-2. Subject to the same restrictions as to price, such houses could also be transferred to a person who would not become an occupant thereof, but only if an agreement was submitted stating that the housing would be held subject to the provisions of General Order No. 60-2. At any time subsequent to 60 days after completion, the original owner or a subsequent owner could petition the National Housing Agency to permit disposition otherwise than as provided in the regulation.

General Order No. 60-3 was later superseded by General Orders Nos. 60-3A, 60-3B, which became effective August 25, 1943, and 60-3C, which became effective November 12, 1943. The superseding orders were, for the purpose of the question before us, substantially the same as General Orders Nos. 60-2 and 60-3.

### III

### The Facts Found

*1. The Business of the Taxpayers.*

The preceding facts are, in the main, admitted. The dispute arises in evaluating the facts testified to by the taxpayers and the inferences which the Tax Court drew from them and the mass of written data. After conceding that an intention

to hold for rental may have existed for a time, the Tax Court stated as its final opinion

> "that the duplexes on Tracts 11451 and 13163 were held by the petitioners primarily for sale to customers in the ordinary course of their business and that they were sold to customers in the ordinary course of that business."

A specific finding to this effect was also made.

If we apply the tests already given [19] it is quite evident to us that, regardless of any original avowed intention to build the particular projects for rental purposes, the business of the taxpayers which they conducted, either directly or through various corporations, which they dominated, of which these transactions were a part, was building for sale and profit. Murphy had been associated with various corporations engaged in building, finance and manufacturing. When he came to California in 1934 he outlined for a finance and construction company plans of apartment buildings and home lay-outs. Later on, in 1941, he, J. S. A. Smith, Edward Pool and Artie Cooke and their wives organized Artcraft to build apartment buildings and homes for individuals on contract. In 1941 they began to interest themselves in wartime priority assisted housing. They applied for and received permission to build the particular structures subject to restrictions as to rental and resale price. The stipulation of facts states that before building the units here involved they built for sale through Artcraft in 1942, 142 houses and 188 in 1943 in tracts which they owned.

While testifying that both he and Pool intended to retain the units here involved for definite income Murphy also stated that their attorneys advised them to discontinue the policy of giving yearly leases on the premises. The last lease was made in April 1946. As leases expired they were not renewed. Murphy admitted that after failing to secure rental increases in 1945 he began to listen to the suggestion of his accountant that the properties be sold because they had risen in value and a large profit could be realized. In the course of his interrogation and while discussing the agreement with Mr. Philip Boland, to act as sales broker, a very significant phrase came in, "speculative builders". The record reads:

> "Q. Do you know whether it is customary for a *speculative builder* to pay a straight five per cent commission to an independent broker or is it customary to do something else? A. Well, a speculative builder usually agrees on so much a building, like we paid, I think, for houses, either 50 or a hundred. They agree on a price. They don't usually pay any five per cent, no." (Emphasis added.)

Edward Pool had been a contractor all his life and he characterized his activities as "speculative builder". At the trial the following colloquy occurred between Pool and counsel for the Government:

> "Q. Were you a builder of houses for sale on your own account? I mean, did you build the houses and then have them sold? A. It was contracted, mostly, and then they could, as you say, you go out and spec on a half-dozen good lots.
>
> "The Court. What do you mean, 'spec'?
>
> "The Witness. When you build them and they are not contracted for previously, you know, until you finish them, and then you sell them on the market to people who come along and buy them.
>
> "Q. (By Mr. Axelrad). In other words, you build them yourself and sell them, and you made the profit on them yourself? A. Yes, sir.
>
> "Q. How much of that did you do? A. Not so much. In other words, when we moved to Long Beach, we built a few homes, you

19. See cases cited in Notes 5, 6 and 7.

know what I mean, in tracts and built them and sold them as we built them. *They were speculative.* They were not contracted for prior to starting.

"Q. You are talking about Artcraft now, are you? A. Yes, sir.

"Q. I am talking about your own private enterprises prior to Artcraft. You said you were a builder all your life. A. That's right.

"Q. What do you mean by that? A. *I built residential properties all my life, individual homes and rental units.*

"Q. *Did you sell them and make a profit on what you sold?* A. *Yes.*

"Q. Or did you build them on contracts for others? A. Both. *The only time I would build for the market, as we say, speculatively, is when you would happen to hit a half-dozen or a dozen real good lots, good locations.*" (Emphasis added.)

In the law of taxation, the courts have recognized the distinction between a person who buys securities (or other property) as a long term investment and the one who buys them for speculative purposes in expectation of a rise in the mar-

ket and for resale to any buyer for a profit.[20]

While the money derived from the sale of these properties was invested by Murphy and Pool in stocks, within two years, they organized corporations in Colorado and New Mexico with the same name as their California building firm (Artcraft Builders), the purpose of which was the building and disposition of residential property for profit. From the Colorado corporation Murphy received a salary of $750 a week as the secretary and treasurer in charge of financing and Pool the same salary as the builder. They drew $500.00 a week each from the New Mexico corporation for like duties. So considering the particular venture in relation to the general activities of the two partners—their "busyness"—we may well apply to their activities before and after the words of the Court of Appeals for the Fifth Circuit in another case:

"It seems fairly inferable from the record that at all times he had (houses) for sale, and that the volume sold depended primarily upon the prevailing economic conditions, brought on by wartime activities and their aftermath."[21] (The word

---

20. Schafer v. Helvering, 1936, 299 U.S. 171, 174, 57 S.Ct. 148, 81 L.Ed. 101. The Court of Appeals for the Fourth Circuit, after approving the rulings of this Court in Richards v. Commissioner, supra, note 6, and in Welch v. Solomon, 9 Cir., 1938, 99 F.2d 41, states the distinction in this manner:
"A distinction has been drawn between investors and speculators who trade in securities on their own account and dealers who keep a supply of securities on hand for resale to customers. But in these cases even under the earlier form of the statute, the significance of a resale to customers was recognized when the courts came to inquire whether a particular taxpayer was an investor or speculator on the one hand or a dealer on the other." (Gruver v. Commissioner of Internal Revenue, 4 Cir., 1944, 142 F.2d 363, 368)
While these expressions are used about persons dealing in securities, there is no valid reason for not applying them to

those who deal in improved real property. They, too, can buy for long-term "investment" or for "speculation" and quick turn-over.

21. Mauldin v. Commissioner, 10 Cir., 1952, 195 F.2d 714, 717. McGah v. Commissioner, 9 Cir., 1954, 210 F.2d 769, does not go counter to this conclusion. There the taxpayers were forced to sell because a bank
"* * * became concerned about the large debt owed by petitioners and demanded that they liquidate some of their properties in order to reduce their indebtedness. It was under this compulsion that the petitioners decided to sell some of the houses then held for rental purposes." (210 F.2d at page 771)
Here, the taxpayers acted *under no compulsion.* They merely decided to sell when the opportunity for high profits presented itself and when they were satisfied, at least in Murphy's case, that taxwise they would gain because he had

"houses" is substituted for "lots".) While the wartime restrictions on resale of wartime and priority assisted housing continued and until they were relaxed and finally removed on October 15, 1945,[22] it was not profitable to sell. The market was very restricted. The highest sales price was $6000. As soon as the restrictions as to resale price were removed, the intention of Associates to sell was formed and their sale was achieved as quickly as possible. The opportunity then arose for an easy profit. Of the 70 duplexes in Tract 11451, 65 were sold at $11,800 per building and 6 at $12,000 per building. The 100 duplexes in Tract 13163 were sold at $13,000 per unit. The results were the unusually large profits from which this litigation stems. So that if it be conceded that the original intention was to hold the units for rental, that purpose was abandoned when a seller's market developed. In quick succession the first group was sold in a few weeks and the next group followed. So, in view of the prior activities of the taxpayers as builders of houses for sale at a profit, the sales under consideration partook of the nature of a business rather than liquidation.[23] It was a continuation of "speculative" selling, temporarily interrupted by war conditions. As stated by the Court of Appeals for the Fifth Circuit:

"Congress intended to alleviate the burden on a taxpayer whose *property has increased in value over a long period of time.* When, however, such a taxpayer endeavors still further to increase his profits *by engaging in a business separable from his investment,* it is not unfair that his gain should be taxed as ordinary income."[24]

2. *The Method of Selling.*

One of the tests uniformly applied in all these cases is the frequency and continuity of the sales.[25] There is no question that once the sale was begun it was continued until both Tracts 11451 and 13163 were fully disposed of. The first deposit on the group of 70 was taken on May 4, 1946. Approximately ten weeks elapsed between the first and last sale. The first sale was closed on June 22, 1946, the last made on September 6, 1946, was closed in October. This group of duplexes was sold to individual owners.

The selling of the second group, the one hundred group, occupied the remain-

been advised that the increased profit would be treated as "capital gain". Much is made in the argument of the fact that Pool was not anxious to sell. However, whatever reluctance he had was finally overcome. To some extent, Murphy may have been the dominant partner, as he was the financier of the group. However, the Tax Court was right in attributing to the partnership the acts of either. After all, in the law of partnership or joint venture, one partner, in carrying on the partnership business, may bind the other by his acts and even by his torts. See, Cal.Corp.Code, §§ 15009(1), 15013; Cal.Code of Civ.Procedure, § 1870(5); B. F. Goodrich v. Naples, 1954, D.C.Cal., 121 F.Supp. 345, 353. Nor is the ruling in Victory Housing No. 2 v. Commissioner, 10 Cir., 1953, 205 F.2d 371, controlling here. The Court there found that the taxpayer "neither bought nor developed real estate for sale". (at page 373) The taxpayers here did. In that case, the taxpayer "did not advertise the houses for sale either through publication or by signs erected on the premises". (at page 373) Here, the taxpayers did both, as the analysis of the sale and advertising campaign carried on indicates.

22. The Executive Orders are found at 50 U.S.C.A.Appendix § 601 note (Executive Order No. 9070). The corresponding regulations are found in Code of Federal Regulations, Book 1, Title 24, Supplement 1943, Part 600, and in Book 2, Supplement 1944, to Code of Federal Regulations, Title 24, Parts 702–703. (General Orders 60–2 and 60–3 conformed to Parts 702–703 of this edition.) The final revision and revocation of private war housing regulations are found in Book 3, 1945 Supplement to Code of Federal Regulations, Title 24, Parts 702–703, pp. 2552 et seq.

23. Home Company, Inc., v. Commissioner, 10 Cir., 1954, 212 F.2d 637, 641.

24. Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217, 220.

25. See references in Note 5.

der of 1946, and was completed by the end of July 1947. This group of duplexes was sold to two owners.

In the disposition of the property the activities of Philip P. Boland become important. Boland had been a real estate broker in California since 1939, except during the four years from 1942 to 1946 when he served in the armed forces. Upon taking terminal leave on January 3, 1946 he visited various persons, among them Murphy and Pool. He approached them about selling the buildings which they had constructed during the war. At first they were not interested. Boland went back to Missouri to visit his relatives. Upon returning in April he again approached them about selling the property. In the meantime, he had become associated with Everett Davis & Son, brokers in Pasadena. As there was little property to sell he undertook to secure listings. On approaching Murphy and Pool he found Murphy receptive to the idea of selling but Pool was not agreeable. He tried to convince him that

> "the time was ripe for selling and they would never have as good opportunity to get rid of them again, that now was the best time to cash in on them."

As he put it, Murphy "saw it (his) way" and later Pool agreed to go ahead and sell some of the units. They agreed to allow him to sell the 70 units which they considered "the less desirable of their income property".

Boland agreed to accept, instead of the customary 5% commission, a fee of $500 a house and permission to use their office, telephone and whatever facilities were available to him in making the sale. He prepared the advertisements which bore the legend "Artcraft Builders, Inc." and their Long Beach address and also the legend that the property was being sold by the "original builders." Very significantly he explained the advantage in using the name of Artcraft in this manner:

> "Q. And how did Artcraft's name get into the advertisement? A. Well, it was a matter of orientation. The property was known as the Artcraft Manor, and these mats, the signature mats, the newspapers had them, and it was a question of utilizing to the best advantage any tool that was available to sell the property.
>
> "Q. Did you consider that there was anything dishonest about saying Artcraft was selling something when you knew it wasn't? A. No, not at all.
>
> "Q. Why not? A. It was merely a matter of advertising. There was nothing unusual about it."

Boland employed two salesmen to assist him. Part of the time he had a girl in the office in addition to the help furnished him by Mrs. Ruby Jean Woodruff who was Artcraft's and Associates' secretary. He prepared the escrow instructions, paid for the advertising which did not exceed $2500. He received a total of $35,000 for selling the houses in the first group. Later he arranged to sell the second group of 100 duplexes. All these sales were fully financed. The Bank of America having refused to finance the loans because the 100 duplexes were sold to two buyers together Murphy arranged with the Insurance Fund Mortgage Company of Massachusetts and Western Federal Savings and Loan Association to secure the financing.

The sale of the second group extended over a year. The sales were made from the office of Artcraft and Associates, the broker using their facilities. In addition to the advertising which bore the name of Artcraft, there is evidence in the record that, at times, communications to prospective buyers were issued under Artcraft's name. The fact that offices in the neighborhood were difficult to secure, as were also telephones, does not minimize these facts. Indeed, Bo-

and and Murphy admitted that the reduction of the commission to a flat fee of $500 was in exchange for the use of these facilities.

While Boland states that, at times, Murphy gave him advice which was not of any value, the fact also remains that the important matter of financing was arranged by Murphy. The advertisements stress sales not by the agent but by "the builders", the taxpayers' wholly owned building company. One such advertisement read:

For Sale
10 Duplexes
By the Builders
Immediate Possession
Two 5-Rm. Apartments
in Each
Almost New
Hardwood floors, tile bath
and wainscoting. Pullman
lavatory  *  *  *  one apartment
vacant in each building  *  *  *
ready for purchaser to move
in immediately at close of
sale. Rent of one apartment
will carry payments on the
building. A splendid bargain
either as a home or invest-
ment. Close to super-market
drug store and shopping
center.
Price          $11,800
Down-Payment
Approx. $720
(For Veterans)
$4650 for Non-Veterans
Open for inspection
Daily and Sunday Until 9 P.M.
Artcraft Builders, Inc.
2187 Lakewood Blvd.
Long Beach
(One Block North of Traffic Circle)
(West side of Lakewood Blvd.)
(Los Angeles Herald-Express,
May 4, 1946)

On the whole, twenty such advertisements appeared in three Los Angeles newspapers, the Los Angeles Herald-Express, the Los Angeles Examiner, and the Los Angeles Times. The earliest is dated May 4, 1946, which marked the beginning of the campaign to sell. The latest is dated November 17, 1946. All were substantially the same. In all the name Artcraft appeared. The emphasis was that the sale was "by the builders". Two advertisements bore the legend *"We're selling 27 duplexes"*. At the bottom of the advertisements was the name "Artcraft Builders, Inc." One appeared in the Los Angeles Herald-Express on August 31, 1946, the other in the Los Angeles Examiner of September 1, 1946. Nowhere in any of these advertisements did the name of Boland appear as selling agent or broker.

Indicative of the fact that these were concerted sales in a seller's market is the nature of the advertisements. When the first advertisement for the group of seventy, which sold for $11,800, was written, it bore the legend "No down payment for veterans". As the sales went faster than predicted, the later advertisements were changed to indicate "down payments for veterans approximately $720.00, Non-veterans approximately $4,650.00."

As to the second group of one hundred, which sold for $13,000, a different procedure was adopted. The advertisements carried the following legend: "Down payment for veterans $2500. No down payment for 2 veterans. Down payment for non-veterans $6500". In all the service-man feature was emphasized. For most of the advertisements bore the legend "Quick service for veterans", and the statement that the properties were "fully approved to meet all GI appraisal and loan qualifications."

When dealing with persons with the business acumen of Murphy and Pool, denial by them of the knowledge of these advertising activities and the fact that the sales were being held out to the public as sales by Artcraft, their wholly owned building company, did not deserve being taken by the Tax Court at face value. So the Tax Court was justified in finding that the sales by Boland were

sales by the taxpayers.[26] Boland was quick to resent any intimation that representation of sale by Artcraft implied any element of deception as the quotation from his testimony, already given, indicates. Indeed, he claims approval of the use of Artcraft's name in the sale by a deputy Real Estate Commissioner of California. And it may be assumed that Pool and Murphy would have resented any representation which did not conform to the facts. The fact that they did not indicates that the sales were indeed by them, under their auspices, at their office, under advertisements which stressed sale by builders with assistance in the financing as to the second group of units sold to two owners when that became important.

There are other facts that show the active participation of the taxpayers in the conduct of the sales. On the escrow instructions to the bank the names of the taxpayers were typed in advance of need. Under them was the word "By". And the testimony in the record is that one of the taxpayers wrote in his name, when a deal was made. Because some of these escrow instructions were prepared in advance, there was a time lag between the date on their face and the signature. Illustrative is an escrow instruction dated August 20, 1946, on which the signing date is given as September 23, 1946. The testimony was that the date was typed in by the bank after the copy of the escrow was returned to the files of the taxpayers.

There are copies of correspondence in the record relating to changes of ownership, giving instructions as to financing and the like, bearing the legend: "Artcraft Builders, Inc., By". Boland's name did not appear on any sign in the windows of the Artcraft office, which was also the office of Associates. In the handling of the actual transfer of title, the procedure was this: The deeds to the property were signed in blank by the taxpayers and their wives and delivered to Mrs. Ruby J. Woodruff without the name of a buyer. A printed form of acknowledgment with the name of Mrs. Woodruff as notary was attached to each Grant Deed. When a buyer was secured, Mrs. Woodruff notarized the deed. So, at times, weeks passed between the time the deeds were signed by the taxpayers and the time they were completed with the name of a buyer and notarized. There is one exhibit in which the deposit receipt was dated August 18, 1946 and the deed presumably dated September 23, 1946. As this is an original, no acknowledgment appears. And one would gather from the correspondence that a sale to another than the person named as grantee may have been made. The escrow statements by the bank, on completion of each transaction were made to William Murphy et al.

All these factors converge to one point: In dealing with the public through advertisements, in the various formal documents relating to the transaction beginning with the escrow instructions to the final deeds, the name of Boland as selling agent *did not* appear. The correspondence with the prospective buyer seems to have been carried on mainly in the name of Artcraft.

In the formal receipts which appear to be a printed form of the type in use in California for such purpose, the word "broker" appears in print as do also the words "seller" and "buyer". Such receipts, when deposits were made were signed by Boland. However, in carbon copies of letters, the original of which was signed by Boland, no indication as to his status as "broker" or "agent" appears under his signature—just the typed name "Philip Boland". The money paid as a deposit was deposited in the bank in the name of the Associates.

26. The Tax Court found:
    "Beginning with the employment of Boland, the four individual petitioners herein began a business of selling real estate, and from April, 1946, the 70 duplexes on Tract 11451, and from July, 1946, the 100 duplexes on Tract 13163 were held by them primarily for sale to customers in the ordinary course of that business."

There is another significant fact: Despite the magnitude of the transaction, no formal written contract relating to the sale of either group of duplexes was entered into with Boland. In his testimony, Boland stated that he put down his proposal as to the sale of the first group of seventy duplexes.

"in a letter and received back a letter more or less as a receipt of what I had sent, and eventually, why, they gave me the go-ahead sign, that they would sell 70 of them, the first 70 that had been built."

Neither letter is in the record. However, Mrs. Woodruff testified that a letter was dictated to her written to Boland with "reference to selling the 70 duplexes and giving him authority or the exclusive or whatever it is called, to sell the 70 duplexes." As to the sale of the second group of 100 duplexes, there is no evidence of even this type of informal agreement.

So the conclusion is warranted that these sales were sales made primarily by, and in behalf of the taxpayers, with the broker paying part of the expense of the sales out of his commission.

## Summary and Conclusion

The record in this case is very extensive. The printed record alone, excluding the exhibits, covers 533 pages. The original transcript and exhibits sent up with the appeals run into hundreds of pages of typewritten and printed documents. All these (which we have studied), the Tax Court had before it. On them it based the one ultimate fact, important on this review, namely, that the duplexes sold during the taxable years were held primarily for sale to customers in the ordinary course of the taxpayers' business and that they were sold to customers in the ordinary course of that business. In a review of this character, our function is not to substitute our judgment for that of the Tax Court. Rather are we to determine if there is substantial evidence to support the conclusion reached by the Tax Court.[27] The trier of fact may disregard uncontradicted testimony, if it is improbable. What is more important, he may make his own inferences from the demeanor of the witnesses' which is "always assumed to be in evidence."[28]

27. "The trial judge has the function of finding the facts, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which he considers most reasonable, and *he has the inherent right to disregard the testimony of any witness* when he is satisfied that the witness is not telling the truth or her testimony is inherently improbable due to its inaccuracy, uncertainty, or interest or bias." (Emphasis added) (Sun Life Assurance Co. of Canada v. Stacks, 7 Cir., 1951, 187 F. 2d 17, 20)
And see, Acme Distributing Co. v. Collins, 9 Cir., 1957, 247 F.2d 607, 611–612.
Appellate Courts should not disturb inferences drawn from facts:
"The District Court, having made findings substantially as stated above, proceeded to make additional findings of the existence of each of the facts on which an executive status, as defined by the Regulations, is made to depend. We believe that the evidentiary facts afford an adequate basis for the inferences drawn by the Court in making such additional findings. At the least, we think

that *in drawing such inferences the Court was not clearly wrong, and conclude that the findings should therefore have been left undisturbed.* The Circuit. Court of Appeals' rejection of those findings cannot rest on the conflicting testimony of petitioner's witnesses. The District Court heard the witnesses, and was the proper judge of their credibilty." (Walling v. General Industries Co., 1947, 330 U.S. 545, 550, 67 S.Ct. 883, 885, 91 L.Ed. 1088) (Emphasis added)

28. Wigmore on Evidence, 3rd Ed., 1940, Vol. III, § 946, p. 498. The late Judge Jerome Frank of the Court of Appeals for the Second Circuit has written what has become almost a classic comment on the signficance of the demeanor of an orally-testifying witness as expressed in the brief statement quoted in the text from Wigmore:
"It is 'wordless language.' The liar's story may seem uncontradicted to one who merely reads it, yet it may be 'contradicted' in the trial court by his manner, his intonations, his grimaces, his gestures, and the like—all matters which

█ These facts are referred to because the taxpayers in their briefs use rather strong language in designating some twenty instances in which, they claim, the Tax Court has placed improper emphasis upon a particular fact. In reviewing these facts, this Court cannot scrutinize the record in order to find whether *one particular fact was properly evaluated or not.* Our function is to examine the record as a whole and determine whether the findings are sustained by substantial evidence, or whether, on the contrary, there is clear error, or the Tax Court has applied an erroneous principle of law to conceded facts.

█ In dealing with the particular problem before us, there is *no one specific* test which the courts have evolved by which the question whether a sale is or is not in the usual course of trade or business can be determined. We have, heretofore, given many of the tests evolved in this and other courts.[29] In what precedes we have discussed their applicability to the facts in the instant case. What the Tax Court found in this

case and what we think *they found correctly,* was that the taxpayers, engaged in "speculative building", over a period of years built residential properties under wartime restrictions while rentals and resale prices were limited. They resold them as soon as prices rose and restrictions on resale of priority assisted housing were removed, making sales *nominally* through a broker, but, in reality, through their own organization, Associates, representing to buyers as an inducement, through advertising and by other means, "sale by builders" in which the broker's name nowhere appeared. Most of the paper work was in the name of the taxpayers, who executed escrow instructions and deeds in blank long in advance of a sale. For a short period of time, the funds were reinvested in stocks. But the taxpayers engaged again in speculative building activities, through new corporations in Colorado and Arizona within two years after completing these sales.

In sum, in arriving at the conclusion that these sales were made in the ordi-

'cold print does not preserve' and which constitute 'lost evidence' so far as an upper court is concerned. For such a court, it has been said, even if it were called a 'rehearing court,' is not a 'reseeing court.' Only were we to have 'talking movies' of trials could it be otherwise. A 'stenographic transcript correct in every detail fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the words signify. The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried'. It resembles a pressed flower. The witness' demeanor, not apparent in the record, may alone have 'impeached' him." · (Broadcast Music, Inc., v. Havana Madrid Restaurant Corp., 2 Cir., 1949, 175 F.2d 77, 80.)

29. The Court of Appeals for the Fifth Circuit has given an elaboration of these tests:
"What was the nature and character of the taxpayer's title to the property, the reason, purpose and intent of the acquisition ·and ownership and the period of its duration; and whether the property was held primarily for investment or

as a part of the taxpayer's 'stock in trade', i. e., as property bought, held and sold for profit?
"What was the vocation of the taxpayer at the time of the sales and prior thereto, whether a real estate broker or engaged in some similar or allied business, having in mind that they may have more than one business; and considering whether the taxpayer maintained only one office and that for his main vocation, and whether his engagement in the additional business was separable from his investment in the property?
"What was the extent of the taxpayer's activity and 'busyness', and whether the additional business was an occupational undertaking to which he habitually devoted time, attention or effort with substantial regularity; and, if the activities were conducted through a representative, whether those activities were carried on by the representative as a part of his own business and at his own expense or primarily in behalf of the taxpayer, and particularly the character and degree of supervision or control exercised by the taxpayer over the representative?" (Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, 356.)

nary course of the taxpayers' business, the Tax Court found not one but, at least, four of the usual elements which courts deem determinative. These we summarize:

(a) *The business of the taxpayers.* Both before and after this transaction the taxpayers were "speculative builders" of homes for profit which were disposed of as quickly as possible after they were built. In 1951, the New Mexico Corporation built 98 houses which were sold immediately. In 1952, the Colorado Corporation built 192 houses which were placed on the market for immediate sale. So that the sales here under consideration fitted into the pattern of their entire business activities.

(b) *Purpose of holding.* The Tax Court found an original rental object later changed into sale in the regular course of business. In the light of the preceding discussion, the Tax Court could have easily found that the rental episode was an incident forced upon the taxpayers by the fact that the resale price was controlled until October 15, 1945, when the price restrictions on resale were lifted, while rent control remained and that the intention to hold for sale existed at all times.[30]

(c) *Frequency and continuity of sales.* That the sales in the instant case meet the test of frequency and continuity cannot be questioned.

Sales activity on the 70 duplexes began early in 1946, and continued to July, 1946. Sales activity on the 100 duplexes began in August 1946, and continued until about June, 1947. Sales went through escrow and were completed by months, as follows: In June 1946, 19 sales; in July, 38 sales; in August, 10 sales; in September, 1 sale; in October, 25 sales; in November, 11 sales; in December, 17 sales; in January, 1947, 13 sales; in February, 18 sales; in March, 6 sales; in April, 2 sales; in May, 2 sales; in June, 3 sales; in July, 3 sales. So it is evident that during most of 1946 and 1947, selling of the houses which their building company, Artcraft, had built was the only business of Associates, the taxpayers' partnership. The sales were continuous and substantial.

(d) *Activity of taxpayers in promoting sale.* Using the name of taxpayers' building corporation (Artcraft) as sellers, promoting sales, using taxpayers' office facilities and aid in financing, all are amply proved.[31]

The Supreme Court has warned us that the capital asset provision of our taxing statutes

"must not be so broadly applied as to defeat rather than further the purpose of Congress."[32]

---

30. Apposite here is the statement of this Court in Rollingwood Corp. v. Commissioner, 9 Cir., 1951, 190 F.2d 263, 266:
 "Although the requirements of the statute are to some extent overlapping, the emphasis in this case is whether the houses were held primarily for sale or primarily for rent. Petitioners contend that the word 'primarily' means 'principal' or 'chief,' while the Commissioner contends it means 'essential' or 'substantial'. For reasons hereinafter stated we think the latter view is more consonant with the legislative policy.
 "Suppose the taxpayer in the instant case intended to rent the houses for as long as he was required to do so under existing regulations and then to sell them. Or suppose his intention was to pursue whichever of these activities proved to be the most profitable, that

is, if the *rental market* were good, he would continue to rent but if the *sales market* were high he would sell. In either of these suppositions we think it is fair to say that one of the essential purposes (in acquiring or holding the houses) is the purpose of sale. Under such circumstances, if the taxpayer does dispose of the houses by sale, is it within the legislative *purpose* to allow him to treat the proceeds of these sales as a capital gain? We think not." (Emphasis court's.)

31. See cases cited in Notes 5, 6 and 29.

32. Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29.
 The Court elaborates:
 "Congress intended that profits and losses arising from the everyday opera-

So, if the facts are viewed in the light of this admonition and the criteria by which it is determined whether particular sales were carried on as a part of the taxpayers' business, it becomes quite evident that the Tax Court was correct in denying to the petitioners in this case the benefit of long-term capital gain and in holding that the sales were those of property held and sold for profit and disposed of in the ordinary course of the taxpayers' business.

The decisions of the Tax Court are affirmed.

tion of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments and to remove the deterrent effect of those burdens on such conversions'. Burnet v. Harmel, 287 U.S. [103] at [page] 106 [53 S.Ct. 74, at page 75, 77 L.Ed. 199]. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. *This Court has always construed narrowly the term 'capital assets' in § 117."* (Emphasis added)

See, Simonsen Industries, Inc., v. Commissioner, 7 Cir., 1957, 243 F.2d 407, 409.